AO 106 (Rev. 06/09)  Application for a Search Warrant

**FILED**

# UNITED STATES DISTRICT COURT

JUN 2 4 2021

for the

Northern District of Oklahoma

**Mark C. McCartt, Clerk
U.S. DISTRICT COURT**

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| | ) Case No. 21-MJ490-JFJ |
| Facebook Account User ID: | ) |
| FACEBOOK.COM/ALETA.THOMAS.79 | ) |
| that is stored at premises owned, maintained, | ) |
| controlled, or operated by Facebook, Inc. | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the <u>Northern</u> District <u>of Oklahoma</u> , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1032(a)(2)(C) | Fraud and Related Activity in Connection with Computers |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1014 | False Statement to a Financial Institution |

The application is based on these facts:

**See Affidavit of TIGTA SA Kelly Cason, attached hereto**.

☑ Continued on the attached sheet.

☐ Delayed notice of_____days (give exact ending date if more than 30 days:_____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Kelly Cason, TIGTA
*Printed name and title*

Sworn to by telephone.

Date: 6-24-21

_____
*Judge's signature*

City and state:  Tulsa, OK

Jodi F. Jayne, U.S. Magistrate
*Printed name and title*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK.COM/ALETA.THOMAS.79 THAT IS STORED AT PREMISES OWNED, MAINTAINED, CONTROLLED, OR OPERATED BY FACEBOOK, INC. | **APPLICATION FOR SEARCH WARRANT**<br><br>**Case No.** _____ |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Kelly Cason, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent with the Treasury Inspector General for Tax Administration (TIGTA). I am currently assigned to the Little Rock, Arkansas Field

1

Office where I investigate financial crimes among other offenses relating to the programs and operations of the United States Treasury Department and the Internal RevenueService (IRS). I have participated in investigations involving the execution of searchwarrants, including the execution of search warrants on computers and other electronic media. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

3.     I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from, among other sources of information: (a) my personal participation in this investigation; (b) reports made to me by other law enforcement agents; (c) review of documentary evidence; (d) information obtained from cooperating witnesses and other sources.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that there is located within information associated with facebook.com/aleta.thomas.79, that is stored at premises controlled by Facebook, further described in Attachment A ("SUBJECT FACEBOOK ACCOUNT"), the things described in Attachment B, respectively,

2

which constitute fruits, evidence and instrumentalities of: Fraud and Related

Activity in Connection with Computers in violation of 18 U.S.C. § 1032(a)(2)(C),

Wire Fraud in violation of 18 U.S.C. § 1343; Bank Fraud in violation of 18 U.S.C.

§ 1344; and False Statement to a Financial Institution in violation of 18 U.S.C. §

1014 (the "SUBJECT OFFENSES").

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is

"a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3) and 18 U.S.C.

§§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the

United States . . . that - has jurisdiction over the offense being investigated." 18

U.S.C. § 2711(3)(A)(I).

## BACKGROUND AND FACTS

7.      In response to the coronavirus (COVID-19) pandemic and economic

crisis, Congress passed the Coronavirus Aid, Relief, and Economic Security

("CARES") Act. The CARES Act was signed into law on March 27, 2020, and it

includes the Paycheck Protection Program ("PPP"). The PPP made federal financial

support available to businesses due to the economic effects of the COVID-19

pandemic. The PPP enabled eligible businesses to borrow funds under certain

advantageous conditions. The PPP loans were originated by financial institutions,

such as banks and credit unions, and were guaranteed by the United States Small

Business Administration ("SBA").

8.      In its PPP loan application to a financial institution and the SBA, a

business entity was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. As a part of these PPP loan applications, businesses often submitted one or more past forms: IRS 944: Employer's Annual Tax Return, and/or IRS 941: Employer's Quarterly Federal Tax Return, along with past W-2s, and/or other IRS tax records in support of their payroll documentation. These payroll figures were used by the financial institutions and the SBA to calculate the amount of money the business was eligible to receive under the PPP.

9.      In addition, the business was required to certify to the financial institution and SBA that it was in business as of February 15, 2020. IRS forms and tax records such as the business's past IRS 941: Employer's Quarterly Federal Tax Return and/or IRS 944: Employer's Annual Tax Return helped financial institutions and the SBA validate the existence of the business as of February 15, 2020.

10.     The PPP loan proceeds could be used by a borrowing business only for certain authorized expenses, such as payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business (a) used the loan proceeds to pay those expense items within a designated time, which was usually within eight to twenty-four weeks of receiving the proceeds, and (b) used at least 60 percent of the PPP loan proceeds on payroll expenses.

11.     During 2019 Aleta Thomas ("Thomas") resided at 11313 East 35th Street, Tulsa, Oklahoma 74146, in the Northern District of Oklahoma. Thomas

4

currently resides at 7333 East 63rd Place, Tulsa, Oklahoma 74133, in the Northern

District of Oklahoma. During 2020, Thomas applied for and received PPP loans

related to these business entities:

1. Coming Correct Community Ministries
2. Coming Correct Community Ministries II
3. Lead US Kids Daycare
4. Lead US Kids Daycare II

(Collectively "the entities"). The loan applications for each of the entities listed

11313 East 35th Street, Tulsa, Oklahoma 74146, as the business address.

12.     Thomas began applying for PPP loans on or about May 4, 2020 and

continued submitting additional loan applications until on or about August 7, 2020.

In January 2021, Thomas made a second round PPP loan application on behalf of

Coming Correct Community Ministries II to Tulsa Federal Credit Union. As a part

of Thomas' PPP loan applications on behalf of the entities, Thomas obtained more

than $458,000 in PPP loans from Tulsa Federal Credit Union, Arvest Bank, Cross

River Bank, and Fundbox.

13.     Investigators conducted surveillance of Thomas' reported business

address, 11313 East 35th Street, Tulsa, Oklahoma 74146, and determined that it was

a small private residence. The owner of this residence, Jenean Holmes, and her son,

Demetrious Harrison, were interviewed by investigators about the businesses

Thomas claimed were operating from the home. They stated that Thomas rented the

property for approximately two years and that there were no daycare businesses or

other businesses operating at that address.

14.    On or about November 23, 2020, investigators interviewed Thomas. Thomas stated she applied for four total PPP loans. Thomas further stated that all four businesses operated at 11313 East 35th Street, Tulsa, Oklahoma 74146.

15.    A search for each of the four businesses on the Oklahoma Secretary of State public corporate entities database resulted in negative search results.

16.    On or about January 6, 2021, agents attempted to locate employees that allegedly worked at Coming Correct Community Ministries II ("CCCM II"). As a part of her PPP loan to Fundbox on behalf of CCCM II, Thomas submitted payroll records generated by Gusto Payroll. Agents were unable to locate any of the employees listed in the payroll and discovered most of the residential addresses listed in this payroll did not exist.

17.    Thomas made several certifications in each of the four loan applications on behalf of the entities, including but not limited to the following:

a.    The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.

b.    Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

c.    The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

d.      The Applicant will provide to the Lender documentation verifying the number of full-time equivalent employees on the Applicant's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan.

e.      I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

Paycheck Protection Program Borrow Application Form.

18.     As a part of Thomas' initial PPP loan applications, Thomas uploaded in support of the applications IRS Forms 944 Employer's Annual Federal Tax Return, IRS Form 941 Employer's Quarterly Federal Tax Returns, and/or IRS Form 1040 U.S. Individual Tax Returns. The purpose of these supporting IRS documents was to help PPP loan lenders evaluate a business entity's eligibility for a PPP loan and determine the correct value of the loan, based in part on the average monthly wages paid by the entities.

19.     On or about December 14, 2020, the United States Attorney for the Northern District of Oklahoma authorized an application, pursuant to 26 U.S.C. § 6103(i)(1), requesting a court order directing the IRS to disclose tax return information for the entities and Thomas.  On or about December 17, 2020, United

States District Judge John Dowdell ordered disclosure of tax return information for the entities and Thomas in case number 20-MC-02. On or about March 8, 2021, the IRS provided tax return information related to Thomas' 2018 personal income taxes. The IRS reported that no return information existed for Thomas' business entities, revealing that none of the tax return information Thomas uploaded in support of her PPP loan applications was submitted to the IRS.

20.     On or about February 17, 2021, Thomas was served with a federal grand jury subpoena and a target letter. On or about February 19, 2021, Thomas appeared before the federal grand jury, was advised of her rights, and agreed to testify. During her testimony Thomas stated that she contacted one or more individuals on Facebook about applying for PPP loans. After their initial contact on Facebook, the individuals called Thomas from a private or blocked telephone number and arranged to meet Thomas at Woodland Hills Mall in Tulsa, Oklahoma to assist Thomas in preparing PPP loan applications.   Thomas testified that during the summer of 2020, she met with two women at Woodland Hills Mall between two and four times to prepare the PPP loan applications and supporting documents, which Thomas, in turn, submitted to the banks. Thomas also testified that she shared information about her email account and bank account(s) with these women. Thomas testified that she has no contact information for the individuals because she only contacted them via Facebook and blocked their telephone numbers.

21.     On or about March 25, 2021 United Stated Magistrate Judge Paul J Cleary signed a Search and Seizure Warrant for United States District Court for the Northern District of Oklahoma Case Number 21-mj-238-PJC related to the

Facebook account FACEBOOK.COM/ALETA.THOMAS.79.  That search warrant was served, but because of a change in personnel, the search warrant was not obtained.  This affidavit is substantially the same as the aforementioned search warrant.

## INFORMATION REGARDING FACEBOOK

22.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

23.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

24.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange

communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

25.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to a particular group of Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can control, for example, the types of notifications they receive from Facebook.

26.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

27.     Facebook allows users to upload photos and videos, which may include
any metadata such as location that the user transmitted when s/he uploaded the
photo or video. It also provides users the ability to "tag" (i.e., identify and label)
other Facebook users in a photo or video. When a user is tagged in a photo or video,
he or she receives a notification of the tag and a link to see the photo or video. For
Facebook's purposes, the photos and videos associated with a user's account will
include all photos and videos uploaded by that user that have not been deleted, as
well as all photos and videos to which the user has been "tagged" by others

28.     Facebook users can exchange private messages on Facebook with other
users. These messages, which are similar to e-mail messages, are sent to the
recipient's "Inbox" on Facebook, which also stores copies of messages sent by the
recipient, as well as other information. Facebook users can also post comments on
profiles of other Facebook users or on their own profiles. Such comments are
typically associated with a specific posting or item on the profile. In addition,
Facebook has a Chat feature that allows users to send and receive instant messages
through Facebook. These chat communications are stored in the chat history for the
account. Facebook also has a Video Calling feature, and although Facebook does
not record the calls themselves, it does keep records of the date of each call.

29.     If a Facebook user does not want to interact with another user on
Facebook, the first user can "block" the second user from seeing his or her account.

30.     Facebook has a "like" feature that allows users to give positive feedback
or connect to particular pages.  Facebook users can "like" Facebook posts or

updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

31.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

32.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

33.    Facebook Notes is a blogging feature that allows Facebook users to write and post notes or personal web logs ("blogs"), and to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

34.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

35.    Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

36.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

37.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

38.    Facebook also retains Internet Protocol ("IP") logs, or IP addresses, for each user ID . These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

39.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

40.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show

how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, users, for example, to "tag" their location in posts, thereby helping Facebook "friends" locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

41.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

42.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

43.     Based on the forgoing, I respectfully submit that there is probable cause to believe that the accounts associated with the Facebook, Inc. profiles described above, stored at the premises owned, maintained, controlled by Facebook, Inc. contain evidence of violations of 18 U.S.C. §§ 1032(a)(2)(C), 1343, 1344, and 1014.

44.     I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the contents of the accounts described in Attachment A, and for the search and seizure of the items more fully described in Attachment B.

45.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement

officer is not required for the service or execution of this warrant.

Respectfully submitted,

Kelly Cason
Special Agent
Treasury Inspector General for Tax
Administration

Subscribed and sworn to by phone on this 24th day of June 2021

Jodi F. Jayne
United States Magistrate Judge

17

## ATTACHMENT A

### Property to be Searched

This warrant applies to information associated with the SUBJECT ACCOUNT: facebook.com/aleta.thomas.79, from April 1, 2020, to September 1, 2020, that are stored at premises controlled by Facebook, a company that accepts service of legal process at 1601 Willow Road, Menlo Park, CA 94025.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on June 17, 2021, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all individuals associated with the account, including stored or preserved copies of messages sent to and from the account, draft messages, the source and destination addresses associated with each message, the date and time at which each message was sent, and the size and length of each message;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank   account number);

c.     The types of service utilized;

d.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Fraud and Related Activity in Connection with Computers in violation of 18 U.S.C. § 1032(a)(2)(C), Wire Fraud in violation of 18 U.S.C. § 1343; Bank Fraud in violation of 18 U.S.C. § 1344; and False Statement to a Financial Institution in violation of 18 U.S.C. § 1014 (the "SUBJECT OFFENSES"), occurring January 1, 2020 and continued through the present, including, for the account or identifier listed in Attachment A, information pertaining to the following matters:

(a) Communications and records relating to Aleta Thomas and all Facebook messages;

(b) Any and all payments made by, instructed to be made by, or related to Aleta Thomas and CCCMII;

(c) Evidence indicating how and when the account was accessed or used, including IP addresses, to determine the geographic and chronological context of account access, use, and events relating to

the SUBJECT OFFENSES and to the account owner;

(d) Evidence indicating the account owner's state of mind as it relates to the SUBJECT OFFENSES; and

(e) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).